## Commonwealth v. Jenkins

414

*Peter A. Galante*, Assistant District Attorney, for Commonwealth.

*Samuel A. Levin*, for defendant.

SLOANE, P. J., March 2, 1960.—James Hudson, also known as Allen Jenkins, was adjudged not guilty by reason of insanity of a charge of larceny on April 2, 1957, by Judge George W. Griffith, of Cambria County, specially sitting without a jury. Pursuant to this judgment, Hudson has been confined in mental hospitals until the present time. Now, however, it is reported by the medical authorities that he is "in remission" of his mental illness, and the question is raised: What disposition is to be made of his case? [1]

Hudson, now 27 years old, has a criminal record dating back to 1949. Prior to the larceny charge, he had been arrested seven times, including thrice on narcotic drugs charges. He was convicted five times, including twice on narcotics charges, and sentenced to imprisonment on four occasions, including two for use of narcotics. The latest of these offenses was a charge of aggravated robbery, of which he was found guilty by Judge Oliver and given a sentence of one to three years in December 1955. The amount involved was fifty cents.

On January 23, 1957, a sanity commission consisting of A. M. Ornsteen, M. D., David M. Kramer, M. D., and D. Arthur Magaziner, Esq., having been appointed

---

[1] Judge Griffith was sitting that particular week as a substitute for Judge Crumlish, and it was Judge Crumlish who signed the order of commitment. Because of the subsequent death of Judge Crumlish, the matter has been referred to the president judge of Judge Crumlish's court.

by Judge Weinrott pursuant to a petition by the warden of Holmesburg Prison, where Hudson was serving his sentence rendered the finding that:

"James Hudson is not now mentally ill, he is of criminal tendencies as indicated by his record of many years but his criminal tendencies do not stem from mental illness. He is not to be committed to a mental institution".[2]

---

[2] In a supporting memorandum accompanying the commission report, Dr. Ornsteen wrote, inter alia:

". . . During his year at Holmesburg Prison he got along all right, had no untoward mental reaction until November 1956 when he began to feel uneasy, nervous, and upset. . . . Here on January 8th he showed bizarre and violent activity, and on the 8th of January threw his clothes out of the cell, threw cigarette butts and matches on the floor, when cigarettes were brought to him from the commissary he refused to accept them. He remembers the latter but says he does not remember throwing his clothes out of the cell. He also recalls refusing food saying he was too scared to eat it thinking that something might have been put in his food and it might have been harmful to him. This is all a thing of the past, he says, admitting now that it must have been imaginary. In explanation of it Hudson said it might have been caused by his guilty conscience of his past life, his life of vice. . . .

"Hudson today shows no psychotic stigmata, he presented a calm mien, showed normal insight into his recent mental disturbance, expressed good judgment in his discussion of his life situations as well as admitting and regretting his faulty way of life. . . . The personnel interviewed agreed that Hudson has been behaving well and apparently normal the past week.

"Because of the prisoner's present normal mental status and negative psychiatric personality profile as well as the short duration and character of his recent acute psychotic disturbance, the diagnosis of schizophrenia cannot be entertained. The Commission believes the psychosis was an acute paranoid state of reactive kind provoked by disturbing influences in the environment acting on his unstable emotional status. The acute psychosis was of benign character, and even though there were paranoid delusions such as is seen in schizophrenia, he cannot be considered psychopathically ill at the present time and should not be committed to the state institution for the criminally insane."

On March 1, 1957, he was released on parole and almost immediately was arrested on March 5th charged with larceny on bill no. 660 of March session 1957. He was examined on March 20, 1957, by John G. Torney, M. D., who found him to be psychotic under a diagnosis of schizophrenia reaction, and recommended commitment to a mental institution.[3] Accordingly, Judge Griffith found Hudson, or Jenkins as he was known on that bill of indictment, not guilty by reason of insanity. Hudson was committed to the Philadelphia State Hospital on May 13, 1957, by order of Judge Crumlish. There he was a management problem, and on January 10, 1958, a decree was signed by Judge Sloane, on death of Judge Crumlish, ordering his transfer to Farview State Hospital. He was transferred to Farview on January 16, 1958.

On March 19, 1959, he was notified by the Pennsylvania Board of Parole that he had completed, as of December 1, 1958, the maximum sentence imposed by Judge Oliver in the aggravated robbery conviction. This ruling was based on credit toward that sentence of the time Hudson was confined in mental institutions: Section 348 of The Mental Health Act of June 12, 1951, P. L. 533, 50 PS §1228.

On May 15, 1959, John P. Shovlin, M. D., superintendent at Farview, reported to the court that Hudson had made a satisfactory adjustment, was in good remission of his mental illness, had received the maximum benefits of hospitalization and should be returned to the committing court for further disposition of his case. A petition for Hudson's discharge was presented.

---

[3] This conclusion of schizophrenia reaction and psychosis was made less than two months after the Sanity Commission and Dr. Ornsteen's report had arrived at precisely the opposite findings. See note 2, supra.

On July 9, 1959, Hudson was ordered committed to Norristown State Hospital for 90 days' observation under a decree signed by Judge Sloane.[4] William P. Camp, M. D., superintendant at Norristown, by letter of September 22, 1959, and Doctors Torney and Hayes, by letter of November 23, 1959, advised this court that they no longer consider Hudson to be psychotic, and that no purpose could be served by further hospitalization. They have qualified their statements, however, with the suggestion that Hudson may well find himself in trouble with the law in the future.[5]

Hudson was released from custody by order of this court signed December 4th, but, on further consideration of the matter, a bench warrant was issued and he was remanded to custody pending final disposition of this proceeding.

This was done, because it seemed that the discharge of a mental patient who has been acquitted of a crime by reason of insanity was governed by the procedure

---

[4] This order resulted from a petition brought by Alice McGinnis Heavey, administrative assistant in Quarter Sessions Court, and the certificates of Drs. Torney and Martin F. Hayes.

[5] Dr. Camp wrote: "It was the opinion of the staff that this man is not psychotic at the present time. The patient has been involved in anti-social activities in the past, and it is very likely that he will again in the future find himself in conflict with the law. In the absence of psychosis, however, no purpose would be served in retaining him in a hospital for mental diseases. The patient's personality difficulties are not treatable by the psychiatric treatments available to the profession at the present time. We are, therefore, respectfully requesting that plans be made to have this patient return to Court for disposition of any charges against him."

Drs. Torney and Hayes wrote: "At the present time defendant shows no evidence of psychosis. There is no guarantee that in the future this man will not again become involved in anti-social activities but at present he can be considered in remission from his mental illness."

of section 604 of the Mental Health Act, 50 PS §1304, and required that the court hold a hearing before ordering the discharge. Furthermore, in light of the guarded and seemingly ambiguous nature of the letters from Doctors Camp, Torney and Hayes, we felt it incumbent to have direct testimony to clarify the situation, both as to Hudson's mental status and his possible threat to society.

Dr. Camp, though invited, was not present but informed the court that no signs of mental illness were observed in Hudson during his entire stay at Norristown, and that he could not be benefited by any further stay there. Dr. Camp predicted that Hudson would become involved in infractions of the law if freed, but ascribed it to a criminal tendency unrelated to mental illness or disturbance.

Dr. Torney did testify. What he told the court comes to this: Hudson's past mental illness has been schizophrenic, during which there are periods of remission, but under stress the schizophrenic illness can appear again. As of now, Hudson's schizophrenic illness is clearly in remission. Hudson's social problems stem, in part, from the fact that he has spent so much time in recent years incarcerated, and out of the usual, normal situations, that he will have difficulties adjusting and conforming to accepted behavior patterns. If he gets in trouble in the future, it will not be because of a mental illness but rather because his adaptability to normal society and its requirements has been weakened by his protracted absence from society, in a "protected environment."

The problem of rehabilitating Hudson, Dr. Torney advises, is a problem of integrating him back into a society from which he has been long withheld, and, in short, the only way it can be done is to return him to that society with guidance and supervision. Dr. Torney stated that as many as 80 to 85 percent of mental

health patients are successfully restored to normal life without recidivism, as compared to a 50 to 60 percent salvage record among criminal parolees.

Dr. Torney's recommendation was that Hudson be released under condition that he submit himself to weekly psychiatric out-patient treatment, reporting to the Neuropsychiatric Division of Quarter Sessions Court monthly, and with the proviso that, if he does not attend the clinic every week, his release be revoked.

Dr. Torney also stated that the nature of Hudson's past condition suggests that it is unlikely that he would engage in crimes of severe violence or sexual depravity. Rather, he might commit acts reflecting what Dr. Torney described as a schizophrenic's unrealistic nature, which would seem to describe the fifty (50) cent robbery of which Hudson was convicted by Judge Oliver, and the larceny of $9.60 of which he was acquitted by Judge Griffith by reason of insanity.

The procedure by which an insane person was to be relieved of responsibiltiy for a crime was enacted in the Act of March 31, 1860, P. L. 427, sec. 66, amended by the Act of April 17, 1929, P. L. 532, sec. 2, as codified in 19 PS §§1351-1355. In 1951, the legislature enacted The Mental Health Act (June 12, 1951, P. L. 533 as amended, 50 PS §§1071-1622) which spelled out in detail the procedures to be followed in the case of mentally ill and mentally defective persons, whether or not they have engaged in criminal activity. The provisions codified in 19 PS §§1351-1355 were not repealed and must be read together with the new statute.

Having been acquitted because of insanity, Hudson was properly committed to a mental institution: Section 341 of the act, 50 PS §1221. But once there, and upon subsequent recovery of his mental health, Hudson finds himself caught between two seemingly conflicting statutory commands:

Section 604 (*a*) of the act, 50 PS §1304 (*a*), provides:

"Any court may order and compel the discharge of any patient committed by the court to any institution if, upon hearing, it appears that such discharge is for the best interest of the patient and not incompatible with the public welfare and safety."[6]

But section 801 of the act, 50 PS §1481, declares and enumerates certain rights of patients committed under the act. It provides:

"Every patient in any institution shall have the right—

". . . (6) To be released as soon as he is restored to mental health and competent to manage his own affairs."

Section 604, as worded, seems to suggest that even though a patient acquitted of a crime by insanity later regains his mental health, he is not automatically entitled to his freedom. This result would seem to follow from the "plain meaning" of the words used, unless the statute is to be read with a gloss that will limit its effect.

On the other hand, section 801 (6) is an unqualified provision, and by its "plain meaning," the only limitation on a patient's right to be discharged is recovery of mental health and ability to manage his affairs.

If it were the legislative intent that section 604 prevail over section 801 (6), that is, if the latter section is limited by and subject to the former, two questions must be faced: First, is the act constitutional as applied to a person acquitted of a crime by reason of insanity but no longer mentally ill or defective? And, if so, then second, what is the significance of the as-

---

[6] Only section 604 is applicable to the discharge of persons committed by the court after acquittal of criminal charges by reason of insanity. Neither section 601 nor 602 applies. The remaining subsections of section 604 deal with the procedure to be followed in holding the hearing.

sertion by Doctors Camp, Torney and Hayes that Hudson is likely to be in further trouble with the law; does this establish that his discharge would be incompatible with the public welfare and safety under section 604? If so, what would be done with him?

There are two appellate court cases which appear to deal with section 604 of the act, but a close reading discloses they are not in point. In Commonwealth ex rel. Fritz v. Farview State Hospital Superintendent, 174 Pa. Superior Ct. 609 (1953), an appeal from the lower court's denial of a writ of habeas corpus, the Superior Court held that the relator was mentally ill and should be kept in the institution. In that case, the relator had been arrested on a morals charge, and the indictment was still before the grand jury at the time the habeas corpus appeal was decided. Writing for the court, Judge Gunther said that, under section 802 of the act, a habeas corpus provision, the burden of proof of mental illness rests on those responsible for the patient's detention, but found that the burden had been "overwhelmingly met."

Commonwealth v. Cook, 390 Pa. 516 (1957), was an appeal from an order of commitment to a mental institution based on the report of a sanity commission. The appellant had been under indictment for what the Supreme Court described as a "brutal triple murder" in 1939, but he had never been tried because of his mental condition. Instead, he had been committed to Farview, where he failed in an escape attempt in 1942 but finally succeeded in escaping in 1955. He was captured in Illinois and returned to Farview on extradition in 1956. In August 1956, Dr. Shovlin, of Farview, petitioned the court to discharge Cook on the ground of sufficient recovery from mental illness, and he was transferred to the county jail.

On the petition of the district attorney, a sanity commission examined Cook and found him still men-

tally ill. The lower court adopted its recommendation, and the Supreme Court affirmed.

In both Fritz and Cook, the court used general language which might indicate that a mental patient with a criminal background was not to be released if he still showed signs of criminal tendencies which posed a threat to society. However, in neither case was the court presented with the problem before us. For one thing, both prisoners were found to be still mentally ill. For another, with criminal charges pending against them, neither one would have been released from custody outright, but rather the choice was between continued care in an institution and a return to prison to stand trial. In neither case did the appellate court consider section 801 (6), and in neither did it have to do so since there was a finding of mental illness.

But in the instant case, Hudson has been acquitted, albeit by reason of insanity, and in no sense can it be said that there are criminal charges pending against him.

We conclude that Hudson should be discharged, subject to the out-patient treatment recommended by Dr. Torney and subject further to revocation of the discharge if Hudson does not faithfully adhere to such psychiatric care. We are guided by the doctors.

First, we think that the letters from Doctors Camp, Torney and Hayes and the testimony of Dr. Torney establishes that Hudson cannot be considered a mental defective or a person suffering from mental illness, as defined in the statute.[7] This might at first seem incon-

---

[7] Section 102 of the act, 50 PS §1072: "As used in this act, unless the context clearly indicates otherwise, the following words and phrases shall have the following meanings: . . .

"(9) 'Mental defective' shall mean a person who is not mentally ill but whose mental development is so retarded that he has not acquired enough self-control, judgment and discretion to manage himself and his affairs, and for whose welfare or that of

sistent with the intimation that Hudson will be a law breaker in the future. But the doctors tell us that not every person who engages in criminal activity does so because of a mental illness or defect, and it follows that the likelihood of engaging in criminal activity does not have to be due to a mental failing. The definition of mental illness for one thing excludes such a sweeping conception. So does the general concept of individual free will and criminal responsibility. In the converse situation, the law does not accept the suggestion that all crime is due to mental shortcoming; the defense of insanity is closely limited, under the prevailing M'Naghten rule in our jurisdiction, and even under broader standards such as the Durham rule and the formulation of the American Law Institute Model Penal Code.

Since Hudson is not mentally ill, he is entitled to his discharge under section 801(6), unless section 604 is construed as a limitation on that right. We hold, under these circumstances, that section 604 does not authorize further confinement of this prisoner.

We so hold without deciding whether Hudson's release would be "incompatible with the public welfare and safety" in any sense. For we think this standard must be read in the light of the Constitution, and that it should be read in its context, as part of a mental health statute.

---

others care is necessary or advisable. The term shall include 'feeble-minded', 'moron', 'idiot' and 'imbecile', but shall not include 'mental illness', 'inebriate', and 'senile'. . . .

"(11) 'Mental illness' shall mean an illness which so lessens the capacity of a person to use his customary self-control, judgment and discretion in the conduct of his affairs and social relations as to make it necessary or adivsable for him to be under care. The term shall include 'insanity', 'unsoundness of mind', 'lunacy', 'mental disease', 'mental disorder', and all other types of mental cases, but the term shall not include 'mental deficiency', 'epilepsy', 'inebriety', or 'senility', unless mental illness is superimposed."

Both the rule of ejusdem generis, and the nature and purpose of the act support the interpretation that the incompatibility with public welfare and safety referred to in the act relates solely to the danger created by the mental condition of the patient. Where, as here, the mental condition, according to the doctors, has improved so that it no longer causes peril, the possible danger from circumstances other than the mental condition do not permit further confinement. In light of the wording of section 801, we think this is the result the legislature recognized and intended.

Not to read the statute thus would create grave constitutional doubt, for a serious question would be raised by finding that the legislature had enacted the confinement of a person not mentally ill merely because of the expectation that he might commit a crime in the future. There would seem to be an unconstitutional deprivation of liberty in a statute which authorized incarceration of persons "of criminal tendency" regardless of actual crimes committed, or in a statute which provided that no prisoner having completed his maximum sentence could be released unless his freedom was "not incompatible with the public welfare and safety." Such a law would serve to give society increased protection from the criminals who prey upon it, but it would involve a type of preventive criminal law based on prediction which is inconsistent with our constitutional system.

So, too, would be a statute that keeps confined a person once mentally ill but no longer so, because it is thought that he may commit crimes in the future. We need not actually decide on the constitutionality of such a hypothetical statute. We are satisfied that the legislature did not intend that section 604 of the Mental Health Act should have this effect, and we so hold.

There remains, then, only the conditional form of release which we render. There is nothing in the act which explicitly envisions what might be described as "psychiatric out-patient probation." Yet we think that such a remedy comports with the general purpose and scheme of the act and that it is not a usurpation of power for the judiciary to fashion it out.

The act provides for the total confinement and full-time medical and psychiatric attention of a person who is mentally ill or defective. Here is a person who is no longer mentally ill but who could become so again. We think that an order which imposes the inconvenience of weekly treatment and faithful coöperation with psychiatric service is not an invasion of Hudson's rights, and that it also provides the maximum amount of security in the public welfare and safety. Furthermore, we are hopeful that, as Dr. Torney testified, Hudson's chances of rehabilitation are good, and will be promoted by this measure of care and supervision. Such rehabilitation, if effected, is in the public interest.

Therefore, we make the following disposition and

### Order

It is hereby ordered and decreed that James Hudson, also known as Allen Jenkins, be released from custody subject to the following conditions:

1. He is to undergo out-patient psychiatric treatment at the Philadelphia General Hospital, with visits at least once a week or more often as directed by the attending psychiatrist.

2. Hudson is ordered to give full and faithful coöperation and compliance to the treatment and directives prescribed by the psychiatrist.

3. In addition to the out-patient treatment, Hudson is to report at least once a month as directed to the Neuropsychiatric Division of Quarter Sessions Court for interview and observation.

4. The Neuropsychiatric Division is to be notified immediately if Hudson is absent from any of his scheduled out-patient appointments, and unless satisfied as to the legitimacy of such absence, is to inform this court, which will revoke the release herein granted.