THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MILTON CARTER, DEFENDANT-APPELLANT.

Argued September 25, 1973—Decided March 6, 1974.

384

*Mrs. Rosemary K. Reavey,* Assistant Deputy Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness,* Public Defender).

*Messrs. Robert D. Clarke and Elson Kendall,* Assistant Prosecutors, argued the cause for respondent (*Mr. Karl Asch,* Union County Prosecutor).

*Mr. David S. Baime,* Deputy Attorney General, argued the cause for *Amicus Curiae* Attorney General of New Jersey (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, *Mr. William Welaj,* Deputy Attorney General, on the brief).

The opinion of the Court was delivered by

PASHMAN, J. This appeal calls upon us to consider the propriety of conditional release for those adjudicated insane both at the time of the commission of an offense and at trial, necessitating commitment to the state hospital and dismissal of the indictment pursuant to *N. J. S. A.* 2A:163–2.

On January 10, 1969, Milton Carter walked into police headquarters in Plainfield, New Jersey and shot and wounded a police officer. Prior to this incident, Carter was withdrawn and had a history of psychiatric care. On June 5, 1970, the Union County Court found Carter both legally insane under the *M'Naghten* test at the time of the offense and incapable of standing trial. He was committed to the state hospital in Trenton "until such time as he may be restored to reason." *N. J. S. A.* 2A:163–2. The criminal indictment was dismissed. In April 1971, Carter filed a writ of habeas corpus in the Superior Court, Mercer County seeking discharge from the hospital. After hearing the testimony of a staff psychiatrist at the state hospital, the court ordered Carter's release and transfer to the Union County Jail to await trial. This order was apparently entered without knowledge or reference to the June 5, 1970 commitment order. Carter's parents began a separate action in Union County Court, Probate Division to have appellant declared mentally incompetent. On September 7, 1971, they were appointed as Carter's guardians. The court approved his voluntary commitment to a school for retarded persons; however, adjustment problems resulted in his being returned to the state hospital. On the basis of further examinations and being of the opinion that Carter's problem was one of mental deficiency rather than mental illness, the hospital director, without court approval, ordered Carter's release in his parents' custody. Finally in March 1972, the Union County prosecutor requested the judge who had entered both the June 5, 1970 and September 7, 1971 orders to review the matter. This resulted in a hearing on the issue of appellant's sanity pursuant to the requirements of *N. J. S. A.* 2A:163–2 as interpreted by *State*

*v. Maik,* 60 *N. J.* 203 (1972). Appellant was not deemed to have been "restored to reason" and was again ordered returned to the state hospital in July 1972, never having been tried for the crime for which he was indicted.

The Appellate Division affirmed this judgment on March 2, 1973 in a *per curiam* opinion, Judge Halpern dissenting. This appeal follows as a matter of right pursuant to *R.* 2:2–1(a). Appellant's recommitment was stayed by this Court on March 13, 1973 pending disposition of the appeal.

At the hearings prior to the entry of the July 1972 order, there was medical testimony indicating that Carter spoke repeatedly about killing himself or others. It was suggested that while he may improve, his condition would not stabilize to such a degree as to warrant his return to the community. Carter's condition was diagnosed as both mental defective with incipient schizophrenia and a catatonic type of schizophrenia. While supervision and medication may reduce the frequency of attacks, there was evidence to indicate that the accurate prediction of future occurrences would be impossible. There was also some indication that the psychotic episodes could be related to appellant's use of alcohol, which is dangerous to those with his condition. In addition, it was stated that with proper supervision, Carter could continue to function without the likelihood of his condition disintegrating.

The trial judge found that Carter's condition had not been cured or neutralized and that defendant was still suffering from schizophrenia and mental retardation. The possibility of release accompanied by supervision was considered indefinite and uncertain; in any event, the court regarded any form of release under supervision as inadequate to protect the public. The court held that there existed the danger of recurring psychotic episodes at any time. The testimony failed to satisfy the trial judge that such episodes would be predictable. In view of the court's findings, Carter was ordered to be returned to the state hospital.

The Appellate Division held that the lower court's findings were more than adequately supported by credible evidence

and that a conditional release would not be utilized unless authorized by this Court or the Legislature. The court noted that even if conditional release was available, the trial court's findings did not justify its use.

The dissent assumed that Carter had been restored to that degree of reason which he is capable of reaching. The issue then became whether this level of reason could be expected to prevail over his underlying illness so that he would not be a threat to his own or society's safety. In this sense, Judge Halpern argues that *Maik* places a responsibility upon the courts to "make considered judgments and take calculated risks in releasing defendants." The alternative is to "condemn this 25 year old defendant to a State mental institution for life because his underlying illness (schizophrenia) is incurable." Judge Halpern would remand the case for a full hearing to determine whether conditional release is warranted in that the court has inherent power "to do justice when the circumstances require it."

Public safety is the primary concern in shielding the public from both criminals and those adjudicated insane. "[T]he aim of the law is to protect the innocent from injury by the sick as well as the bad." *State v. Maik, supra* at 213. The criminal is punished by a prison term and hopefully deterred from further unlawful acts. Another object of confining the insane is treatment and rehabilitation. They are an "exceptional class of people" who have demonstrated their threat to society by committing an act harmful to others. *Overholser v. Leach,* 103 U. S. App. D. C. 289, 257 *F.* 2d 667, 669 (D. C. Cir. 1958).

Since *Maik,* release is based on a test more demanding than the *M'Naghten* standard required for initial commitment. Confinement to a state institution is to continue not only until manifestations of the illness have abated and the offender once again can distinguish right from wrong, but until the underlying illness from which psychotic episodes emerge is cured. Given an individual's demonstrated capacity to violate the law, coupled with his susceptibility to psychotic

episodes depriving him of reason, anything short of confinement "would fail to protect the citizens from further acute episodes." *State v. Maik, supra* at 217. The underlying illness is the defect of reason which must be restored prior to release.

■ While the Court recognizes the overriding concern for public safety involved in commitments subsequent to an adjudication of insanity, we do not believe that the commission of an offense against the laws of this State by one subsequently adjudicated insane and committed to a state hospital is a *carte blanche* justification for lifetime commitment where the underlying mental condition is incurable. We recognize that some patients will be faced with lifetime commitment; however, we can discern no legislative intent to confine others for those periods during which they may be capable of functioning in society so long as reasonable assurances are provided that no harm will come to the public. We therefore reverse the judgment of the Appellate Division and remand to the trial court for a hearing on the propriety of conditional release.

The question as to conditional release now before this Court arises under commitment pursuant to *N. J. S. A.* 2A:163-2. The statute provides in part:

If any person in confinement under commitment, indictment or under any process, shall appear to be insane, the assignment judge, or judge of the county court of the county in which such person is confined, may, upon presentation to him of the application and certificates as provided in Title 30, chapter 4 of the Revised Statutes, institute an inquiry and take proofs as to the mental condition of such person. The proofs herein referred to may include testimony of qualified psychiatrists to be taken in open court by the judge, either in the presence of a jury specially impanelled to try the issue of insanity alone, or without a jury, as the judge in his discretion may determine. It shall be competent for the judge if sitting without a jury, or the jury, if one is impanelled, to determine not only the sanity of the accused at the time of the hearing, but as well the sanity of the accused at the time the offense charged against him is alleged to have been committed.

* * * * * * * *

 If it shall be determined after hearing as aforesaid, that the accused was insane at the time the offense charged against him is alleged to have been committed, the charge against him shall be dismissed on this ground and the records of the proceedings so noted. In this event, the judge or jury, as the case may be, shall also find separately whether his insanity in any degree continues, and, if it does, shall order him into safe custody and direct him to be sent to the New Jersey state hospital at Trenton, to be confined as otherwise provided by law, and maintained as to expense as is otherwise provided for the maintenance of the criminal insane, until such time as he may be restored to reason, and no person so confined shall be released from such confinement except upon the order of the court by which he was committed. This section shall not be construed to prevent the use of the writ of habeas corpus.

* * * * * * * *

Determination can be made as to the prisoner's sanity both at the time of the hearing and as it existed at the time of the offense charged. Where the accused is adjudicated insane in both instances, the charges are to be dismissed and, if insanity continues in any degree, the court is to order the accused committed to the New Jersey state hospital at Trenton. He is to be maintained as to expense in the manner provided for the "criminal insane, until such time as he may be restored to reason . . . ."[1] Release is possible only upon court order.

 ■■ The failure of *N. J. S. A.* 2A:163–2 to expressly provide for conditional release is not dispositive of the question of legislative intent or policy The spirit of legislative direction prevails over its general terms. *Dvorkin v. Dover Twp.,* 29 *N. J.* 303, 315 (1959). The fundamental purpose for which the legislation was enacted controls. *New Jersey Builders, Owners and Managers Ass'n v. Blair,* 60 *N. J.* 330, 338 (1972). See also *Jersey City Chapter Prop. Owners, etc. Ass'n v. City Council,* 55 *N. J.* 86, 100 (1969); *Capulo v. Best Foods,* 17 *N. J.* 259, 264 (1955); *Alexander v. New Jersey Power & Light Co.,* 21 *N. J.* 373, 378 (1956); *Wright v. Vogt,* 7 *N. J.* 1, 6 (1951). It is not the words but the "in-

---

 [1]"Criminal" in this context refers to the means by which the patient was committed, not his status as a lawbreaker.

ternal sense of the act that controls." *San-Lan Builders, Inc. v. Bexendale,* 28 *N. J.* 148, 155 (1958). See also *Board of Education, Asbury Park v. Hoek,* 38 *N. J.* 213, 231 (1962).

[The] will of the law-giver is to be gathered from the object and nature of the subject matter, the contextual setting, and the mischief felt and the remedy in view . . . [and the] particular terms are to be made responsive to the essential principle of the law. *San-Lan Builders, Inc. v. Baxendale, supra* 28 *N. J.* at 155.

"Where a literal rendering will lead to a result not in accord with the essential purpose and design of the Act, the spirit of the law will control the letter." *New Jersey Builders, Owners and Managers Ass'n v. Blair, supra,* 60 *N. J.* at 338. Reason is the soul of law. *Wright v. Vogt,* 7 *N. J.* 1 (1951).

The legislative intent underlying sections 2A:163–2 and 2A:163–3 is protection of the innocent from injury. To this end, those not "restored to reason" are to be confined in the state hospital. Where there is no danger or threat of harm to the public, commitment assumes a different light. The *amicus* brief contends that assurance that psychotic episodes will not recur coupled with supervisory controls to detect deterioration of the patient's condition would satisfy the "restored to reason" test. While we clearly do not accept that position, the fact that some possibility of harm to society is eliminated or so reduced as to render prediction of episodes possible under proper supervision weakens the continued justification for commitment.

It has been argued that since *N. J. S. A.* 30:4–107 provides for the conditional release by hospital authorities of those civilly committed, the absence of such a provision in *N. J. S. A.* 2A:163–2 precludes it. This interpretation assumes that the Legislature intended to permit hospital administrators to conditionally release patients civilly committed while denying similar powers to the judiciary as to the "criminally" insane. It is more likely that the Legislature, in omitting a specific authorization for court sanctioned

conditional release, was merely recognizing the court's inherent power to fashion appropriate remedies.

■ The fact that the Legislature has acted to provide a remedy does not mean that the judicial branch is limited to the boundary lines of strict legislative expression in fashioning or denying remedies in a particular case. *Shell Oil Co. v. Marinello,* 120 *N. J. Super.* 357, 375 (Law Div. 1972), mod. and aff'd 63 *N. J.* 402 (1973). "[W]ithin the bounds of their respective duties and powers, both the executive and judicial branches must 'adjudicate' and 'legislate'." *David v. Vesta Co.,* 45 *N. J.* 301, 324 (1965). It is now well recognized that "judicial decision making is often creative and requires that judges, although in a strictly limited sense, 'legislate.'" *State v. Johnson,* 43 *N. J.* 572, 583 (1965), aff'd 384 *U. S.* 719, 86 S. Ct. 1772, 16 L. Ed. 2d 882, rehearing denied 385 *U. S.* 890, 87 S. Ct. 12, 17 L. Ed. 2d 121 (1966). Contemporary judicial decisions announcing a new rule of law "are the product, not only of re-evaluation of abstract principles of justice but also of practical considerations. . . ." *State v. Johnson, supra* at 583.

■■ The court's power to fashion remedies in the realm of criminal justice is unquestioned. At common law, courts of criminal jurisdiction had the power to suspend sentences. *In re Baer,* 140 *N. J. Eq.* 571, 573 (E. & A. 1947). Probation has a deep-rooted common law basis. The enactment of a statute relating to a particular aspect of probation does not preempt the entire field. *Lathrop v. Lathrop,* 57 *N. J. Super.* 532, 538–539 (App. Div. 1959). It follows that a statute neglecting to mention .probation would certainly not preempt the court's ability to provide for it. Just as the primary concern of release under *N. J. S. A.* 2A:163–2 is that of public safety, probation has long been applied upon the condition that "the court considers that [the offender] may be reformed and is persuaded that probation in the particular case is not inimical to the well being of society generally." *State v. Pascal,* 133 *N. J. L.* 528, 531 (Sup. Ct. 1946), aff'd 1 *N. J.* 261 (1949). See *Ex Parte Samber,* 13

*N. J. Super.* 410, 412–413 (Law Div. 1950). The same analysis is applicable to the court's use of "probation" in the commitment context. If there is a distinction between the court's authority to provide for probation in the criminal context and an analogous release system as to those adjudicated insane, this Court fails to discern it. The courts have power to fashion psychiatric out-patient probation in the form of conditional releases.[2]

▮ The Legislature's contemplation of additional remedies under *N. J. S. A.* 2A:163–2 is further compelled by the existence of a legislative provision for the humane care and treatment of the mentally ill.

Every individual who is mentally ill or mentally retarded shall be entitled to humane care and treatment and, to the extent that facilities, equipment and personnel are available, to medical care and other professional services in accordance with the highest accepted standards. *N. J. S. A.* 30:4–24.1.

While the Court is not now directly faced with delineating the scope of the right to treatment in New Jersey, the existence of such a right bears on the availability of conditional release, at least to the extent that such release is a therapeutic measure. The right to treatment is an affirmative obligation on behalf of the State.

It is beyond question that a person committed to a state hospital for the mentally afflicted has a right to receive treatment in an effort to cure or improve his or her condition. It is a notorious fact that over-crowding and under-staffing in our public mental institutions result in inadequate treatment for the average patient. But recognition must be given to a patient's right to treatment. It is not enough to confine the patient, to afford only minimal custodial care, to institutionalize him or her in a mental prison. * * *

We recognize that the Legislature is better equipped to create specific procedures and establish the necessary institutions to insure a mental patient's right to treatment than are the courts. However, in the absence of any legislative implementation, the court must func-

---

[2]This power is specifically recognized in *Commonwealth v. Jenkins*, 21 *Pa. D. & C.* 2d 413 (1960).

tion to protect the rights of persons committed to our public mental institutions. The court may insure that the administrators have performed their task with care and reached a reasonable result. *In re D. D.*, 118 *N. J. Super.* 1, 6 (App. Div. 1971). 

In recognizing the right to treatment, the Court of Appeals for the District of Columbia went so far as to indicate that where a statute required a bona fide effort to "cure or improve" the patient (*D. C. Code* § 21-562) "conditional release may be in order if it appears that the opportunity for treatment has been exhausted or treatment is otherwise inappropriate." *Rouse v. Cameron,* 125 U. S. App. D. C. 366, 373 *F.* 2d 451, 458-459 (D. C. Cir. 1966).

Viewed solely in terms of the goal of protection, continued institutionalization offers many obvious benefits. When an ill person poses a physical danger to himself or others, institutionalization offers more effective protection than any other form of disposition. Removed to a place distant from their families and from population centers, the mentally ill can find total shelter from the relationships they had found impossible to manage. They can live in a locked ward with the staff alerted to the control problems they may pose and empowered to administer whatever tranquilizing medications seem necessary.

As noted, the problem becomes most acute, when, as here, the patient's underlying or latent personality disorder is incurable but in a state of remission. Confinement until "restored to reason," under these circumstances, is tantamount to a commitment for the offender's natural life. Clearly, a person with such a mental state should be subject to supervisory and clinical control for the protection of society. Yet, treatment is inherent in the rationale, not merely confinement.

When a patient is in a state of remission and there are sufficient medical assurances that he will not pose a threat to the public safety if at large, prolonged confinement can serve no therapeutic purpose. Retribution is inapposite, since the mentally ill, by definition, are not criminally responsible for their

behavior. So too, the concept of deterrence has no applicability. Prolonged detention under "a total recovery" standard, in these circumstances, equates institutionalization with a prison sentence and thereby defeats the very purpose for which *N. J. S. A.* 2A:163–2 was enacted.

The value of conditional release as a therapeutic measure is to be considered against the background of the Legislature's intent to provide "humane care and treatment." Surely there is a point reached where a patient can no longer benefit from confinement in the artificial and protected environment afforded by a mental institution.[3] Perhaps even more compelling is the harm which could occur to patients confined in institutions when contact with the outside world would stimulate them to recovery or prevent deterioration into more harmful states.[4] It has even been suggested that "psychiatrists might be forced into certifying evasive reports in order to prevent continued detention and to avoid the possible harm to a rehabilitated patient which the denial of a discharge might cause. . . ." Note, "Releasing Criminal Defendants Acquitted and Committed Because of Insanity: The Need for Balanced Administration," 68 *Yale L. J.* 293, 299 (1958-1959). While the Court doubts that this will occur, it recognizes the possible need for contact with a more normal environment. See Weihofen, "Institutional Treatment of Persons Acquitted by Reason of Insanity," 38 *Tex. L. Rev.* 849 (1959-1960).

Lifetime sequestration from society is a harsh "treatment" for one who lacks criminal intent. This is especially compelling where science is unable to conclusively diagnose and treat or cure what we consider to be unacceptable or intolerable behavior deviations.

---

[3]Glueck, *Law and Psychiatry: Cold War or Entente Cordial?* 152–153 (1966)

[4]See Wedge, "Changing Perceptions of Mental Health," 48 *Mental Hygiene* 22, 29 (1964).

Conflicting medical testimony was presented at the hearings. Dr. James B. Spradley, testifying for the State, characterized defendant as "potentially dangerous to others." Based upon previous examination, the psychiatrist diagnosed defendant's illness as "catatonic schizophrenia" which compounded other "appreciable" mental deficiencies. He recommended continued hospitalization since, in his opinion, "neutralization" could only be temporary.

Dr. Emdre Nadas, director of the Union County Psychiatric Clinic, agreed that the defendant was mentally defective, but disputed Dr. Spradley's characterization of the illness as "catatonic schizophrenia." In his opinion, any manifestation of schizophrenia was "residual" at the time of the hearing. He thus concluded that defendant would not suffer another severe episode if properly supervised and treated with medication.

The defense produced Dr. Eugene Revitch, who had previously testified at defendant's initial sanity hearing. In essence, Dr. Revitch concluded that defendant was no longer dangerous and that he could safely be reintegrated into society.[5] The doctor found that "the personality organization which may produce such an illness" continued and that "in complex situations" defendant's stability may "disintegrate," but with proper treatment and supervision, reintegration was possible. Nevertheless, Dr. Revitch could not predict with certainty that future psychotic episodes would not occur. Such predictions generally appear to be, at best, tenuous. See Rubin, "Prediction of Dangerousness in Mentally Ill Criminals," 27 Arch. Gen. Psychiat. 397 (1972).

This Court will not foreclose the possibility of conditional release where warranted by a patient's condition or advancements in techniques of psychiatric care. The balance to be

---

[5] In his dissent from the Appellate Division's holding, Judge Halpern points out that Carter has been functioning as a member of society without untoward incident while living with his family for the past year. He is apparently employed and has missed only one or two appointments for treatment at the psychiatric clinic.

struck between standards of release and protection of the public is a delicate one. The difficulty of achieving that balance, however, cannot serve as an excuse for our failure to meet the challenge of integrating the mentally ill back into the mainstream of society.

There are those who feel that there should not even be any mental hospitals for the "criminally insane." It has been argued that the distinction between a mental hospital and a prison is little more than a "semantic hoax." Even where some form of release is available from a security oriented mental institution, the supervising authorities and the court act as warden and parole officer. The patient's initial confinement is alleged to be occasioned by the fear of some "sick" people being permitted to go free. Szasz, "Psychiatry, Ethics, And The Criminal Law," 58 *Col. L. Rev.* 183, 196–198 (1958).

This approach is noteworthy in the freedom given to patients and their psychiatrists for rehabilitation purposes, yet wholly ignores considerations as to the protection of society. Surely a psychiatrist would not allow a patient to come and go as he pleased when the doctor was convinced that his patient was bent on and capable of perpetrating a violent crime. Similarly, society and the courts cannot be asked to ignore the commission of an act in violation of the State's criminal laws. The actor shows by his behavior that he poses some threat. This demonstrated ability to cause harm distinguishes him from others who may very well be as abnormal or "sick" but only possess a potential to harm others. We may not search out the deranged, sick or abnormal among us, but when they announce themselves to us with an otherwise criminal act, there is no reason to ignore them. Nor, however, is there reason to perpetually confine them.

Conditional releases accompanied by judicial and psychiatric supervision can be utilized under appropriate circumstances to keep a tight rein on possibly inaccurate and divergent psychiatric prediction. The alternative is to condemn all those who are not utterly free of an underlying mental ill-

ness to lifelong commitment in a mental hospital, regardless of the degree to which they can function and exercise control over themselves in society and regardless of the therapeutic effect of exposure to the outside world. In effect, denying the possibility of conditional release is "tantamount to an elaborate mask for preventive detention" of the mentally ill.[6]

It is for the Court to determine when one has been restored to reason and is able to function in society without fear of harming others. *N. J. S. A.* 2A:163–2. The doctor's concern is solely that of his patient's mental health. The community determines the extent of a threat to public tranquility posed by a particular patient. The Court is in a position to balance both viewpoints. The interaction between "the court's inherent interest in civil rights and the psychiatrist's primary interest in therapy" will serve to develop and define criteria which amalgamate both concerns. Goldstein and Katz, "Dangerousness And Mental Illness: Some Observations On The Decision To Release Persons Acquitted By Reason Of Insanity," 70 *Yale L. J.* 225, 232 (1960-1961).

The Court specifically addressed itself to release standards in *State v. Maik, supra.*[7] While noting that the goal of con-

---

[6] R. Greenwald, "Disposition Of The Insane Defendant After 'Acquittal' — The Long Road From Commitment To Release," 49 *J. Crim. L. C. & P. S.* 583, 586 (1959).

[7] *Maik* concerned commitment pursuant to an acquittal by reason of insanity under *N. J. S. A.* 2A:163–3, which provides as follows:

If, upon the trial of any indictment, the defense of insanity is pleaded and it shall be given in evidence that the person charged therein was insane at the time of the commission of the offense charged in such indictment and such person shall be acquitted, the jury shall be required to find specially by their verdict whether or not such person was insane at the time of the commission of such offense and to declare whether or not such person was acquitted by them by reason of the insanity of such person at the time of the commission of such offense, and to find specially by their verdict also whether or not such insanity continues, and if the jury shall

finement is to remove the underlying condition, the Court indicated that something less than a "cure" is acceptable for compliance with the "restored to reason" standard of conditional release established by *N. J. S. A.* 2A:163–2 and 2A:163–3. See generally Note, "Release From Confinement of Persons Acquitted by Reason of Insanity In New Jersey," 27 *Rutgers L. Rev.* 160, 167–173 (1973); Reid, "Disposition of the Criminally Insane," 16 *Rutgers L. Rev.* 75, 120–132 (1961); Note, "Criminal Responsibility," 4 *Seton Hall L. Rev.* 295, 304–310 (1972). One's condition need only be "effectively neutralized." This neutralization is apparently something less than a cure which eliminates the underlying illness in its entirety. Neutralization, however, is clearly something more than remission. The mere abatement of symptoms absent an expectation that reason will prevail, provides no assurance that the public is safe from harm.

At some point or range beyond the scope of what is considered either normal or acceptable behavior, we begin to delineate a class of people who, having committed an unlawful act, do not know right from wrong and require psychiatric attention. "Restored to reason" indicates that the patient not only knows right from wrong and is once again within the normal or acceptable range on the behavior continuum, but that the patient also is free of his underlying condition which could be triggered and catapult him once again into the realm of those considered insane for commitment purposes. Neutralization, then, could be a state of recovery more permanent than that brought about by a mere remission of symptoms or control of the patient's environment. It could be something less than a complete "cure," allowing for the limited possibility of relapses. The in-

---

find by their verdict that such insanity does continue, the court shall order such person into safe custody and commit him to the New Jersey state hospital at Trenton until such time as he may be restored to reason.

The standards for release under this section and *N. J. S. A.* 2A:163–2 are identical.

dividual whose condition is "neutralized" can cope with the world as it is, without supervision and guidance. At this juncture, all that can be said is that while neutralization is not an outright cure of the illness, it is a state which the patient has achieved where there is no danger to those around him of injury from a psychotic episode arising from the illness.

Conditional release is a third alternative for release if one has not been fully "restored to reason" or one's condition "neutralized."[8] It is based upon the ability to predict or foresee psychotic episodes after such release. This alternative, left open for consideration in *State v. Maik* and now before the Court, apparently involves release under certain conditions where remission has occurred. The patient is to be returned to custody "if signs of an oncoming acute illness should appear." *State v. Maik*, 60 *N. J.* at 220. This step is humane only if, taking the protection of society into consideration as well as the patient's rights, "adequate medical assurance could be given that supervision is reasonably feasible . . . ." *State v. Maik* at 220-221.

---

[8]A provision for conditional release is now before the Legislature. See *Commission On Criminal Law Revision, Final Report, The New Jersey Penal Code* (1971). It should first be noted that the Proposed Code changes the insanity test in New Jersey to one somewhere between the current *M'Naghten* standard and the *Durham* test this Court rejected in *State v. Lucas, infra.* While we recognize that the Code presents a single integrated approach to the problem of legal responsibility, the procedures and standards recommended therein are equally applicable to proceedings under the *M'Naghten* rule with respect to the conditional release problem.

The proposed Code provides that all acquitted patients be placed in the care of the Commissioner of Institutions and Agencies for "custody cure and treatment." Section 2C:4–8(a). Once a patient is committed, the Commissioner may decide that he should be released and, if so, he must then apply to the committing court for an order to transfer, conditionally release, or discharge the offender. *Id.* The court is then to appoint two psychiatric experts who are to report back to it within sixty days. *Id.* The court may then conditionally release the patient (parole), provide for civil commitment, or maintain the *status quo.* The patient may be recommitted for violations of treatment within five years of his release. Section 2C:4–8(d).

The effect of a determination of insanity or a successful plea of insanity under *N. J. S. A.* 2A:163-2 or 2A:163-3 is that no indictable "crime" was committed. The offender is not a criminal, but an individual requiring medical attention. The basis for his confinement is rehabilitation and treatment. Any standards for release must be based on this nature of commitment, given the overriding concern for the public safety. Any consideration of punishment has no place in a proceeding on the question of conditional release. There has been no criminal act to punish. The stigma of criminal is not imposed upon the mentally ill. See *State v. Maik* at 213. "[I]f the defendant was insane when the alleged crimes were committed, he is just as innocent legally as if they were perpetrated by some other person." *State v. Stern,* 40 *N. J. Super.* 291, 296 (App. Div. 1956). There is no criminal to incarcerate There is, however, a patient to be treated.[9] See *Hough v. United States,* 106 U. S. App. D. C. 192, 271 *F.* 2d 458 (D. C. Cir. 1959).

Given this Court's endorsement of conditional release under *N. J. S. A.* 2A:163-2 and 2A:163-3, it would be helpful in guiding the trial court's formulation of standards and procedures to examine provisions in various other jurisdictions. Approximately two-thirds of the states presently have statutory provisions governing conditional releases. Some jurisdictions utilize "public safety" as the release criteria.[10] Others

---

[9]Where conditional releases were referred to as "probationary" in nature by a statute, the release of patients under the criminal probation system has been held a violation of the Fourteenth amendment. The "state may not constitutionally impose criminal sanctions against persons who have committed no crime." *Scheidt v. Meredith,* 307 *F. Supp.* 63, 66 (D. Colo. 1970).

[10]See, *e. g. Ala. Code,* tit. 45 § 219 (1972), which permits release when reason has been restored to the extent that the patient may safely be removed from the institution; *Cal. Penal Code* §§ 1026 and 1026(a) (1972), patient may be removed when he is no longer a danger to the health and safety of others; *Colo. Rev. Stat. Ann.* Ch. 39 § 8-4(4) (a) (1967), when patient has no abnormal mental condition which would be likely to cause him to be dangerous; *D. C. Code*

focus on conditions most conducive to the patient's recovery, or "best interests."[11] Still others leave the decision to whenever the court deems it appropriate.[12] See generally, Hamann, "The Confinement And Release Of Persons Acquitted By Reason Of Insanity," 4 *Harv. J. Leg.* 55 (1966–1967). Few legislatures have provided specific guidelines for the court in administering conditional releases.

*Ann.* § 24–301(e) (1967) patient has recovered sufficiently so that, with the conditions imposed, he will not in the reasonable future be a danger to himself or others; *Louisiana Code of Crim. Proc. Art.* 654–658 (1972); patient can be removed if no longer a danger to himself or to others; *Md. Art. 59* § 27 and § 28 (1973), patient may be removed if no longer a danger to himself or to the safety of the person or property of others; *Nev. Rev. Stat.* §§ 175.521 and 433.570 (1969), patient's release will not be detrimental to the public welfare; *Ohio Rev. Code Ann.* § 2945.39 (1973), release will not be dangerous to the public; *Oregon Rev. Stat.* §§ 161.329, 161.335, 161.340 (1972), patient does not present a substantial danger to himself or to others and can be controlled adequately and given proper care; *Wash. Rev. Code Ann.* tit. 10 §§ 76.040, 76.070 (1972), patient is free of any danger of relapse and is a safe person to be at large.

[11]See *e. g., Florida Rules of Crim. Proc.* 1.460 (1972), release mandated when in the best interests of the patient; *Ill. Ann.* Ch. 38 § 1005–2–4 (1971) patient may be conditionally released if in his best interest and release becomes absolute if not returned to hospital within one year; *Kansas Stat. Ann.* Ch. 22 § 3428 (1972), in the patient's best interests; *Mo. Ann. Stat.* §§ 552.040 and 202.830 (1972), in the patient's best interests; *N. Mex. Stat. Ann.* Ch. 41 § 23–35 and Ch. 34 § 2–5, 2–10, 2–11 (1972); *N. Y. C. P. L.* § 330.20 (1972) when it is in the best interest of the patient and upon condition the court determines to be necessary; *Tenn. Code Ann.* §§ 33–710, 609(d)–612 (1972), in patient's best interests; *Wyoming Stat.* §§ 7–242, 243 and §§ 25–60, 69 (1972), in patient's best interests.

[12]See *e. g., Conn. Gen. Stat.* § 54–38 (1958); Idaho Code §§ 18–213, 214 (1972); *Mich. Stat. Ann.* § 28.966 (12) and § 14.825(1), M. C. L. A. §§ 767.27b, 330.35a (1972); *Me. Rev. Stat. Ann.* tit. 15 § 1041 (1972); *Minn. Stat. Ann.* § 631.19 (1972); *Montana Rev. Code Ann.* tit. 95 § 508 (1971); *N. H. Rev. Stat.. Ann.* § 607:3; *R. S. A.* § 135:28, § 135:29 (1972); *Pa. Stat. Ann.* tit. 50 §§ 4413, 4406, 4418–20, 4423 (1972); *Wisc. Stat. Ann.* § 971.17 (1972); *Virgin Islands Code Ann.* tit. 5 § 3637 (1972).

Chief Justice Weintraub first suggested the desirability of conditional release in *State v. Lucas,* 30 *N. J.* 37 (1959).[13] He noted the marked disagreement of medical "men of imposing qualifications" and stated it was "not willing to let the security of society depend upon a science which can produce such conflicting estimates of probable human behavior." 30 *N. J.* at 86. The Chief Justice went on to state:

A release from custody would be something else if (1) it depended upon an affirmative medical opinion that a recurrence of illness is strongly negatived; (2) there were parole supervision; (3) there were a firm grip upon the man to the end that he could be returned to custody upon signs of possible recurrence without awaiting the commission of another anti-social act; and (4) the heads of mental institutions were oriented to the added responsibility which would be theirs. 30 *N. J.* at 86.

The court's inquiry as to conditional release must be as broad as possible. Good patients may be bad risks. The disposition must be individualized with the focus on the offender, not the offense he committed, although such offense can serve as an indication of the harm the patient is capable of inflicting. Perhaps most important is the establishment of psychiatric out-patient care. The conditions under which the patient will live after release should certainly be conducive to his recovery, or at the very least, not aggravate his condition His family life and friends, the area in which he lives and work that he could obtain, if it would be helpful, are all relevant. See generally, Weihofen, *supra.*

The success of conditional release depends, to a large extent, upon the adequacy of the supervisory controls imposed by the courts to insure the public safety. The most obvious condition for safeguarding the community against a repetition of criminal behavior is a careful follow-up and

---

[13]The Court rejected the liberal Durham test of insanity, which relied largely upon medical concepts of mental illness. See *Durham v. United States,* 94 U. S. App. D. C. 228, 214 *F.* 2d 862 (D. C. Cir. 1954).

required attendance for psychiatric treatment over a long period of time. Of course, the frequency of visits to the treating psychiatrist would depend upon the individualized circumstances of each case. But, in any event, the psychiatrist must continuously evaluate the patient's adjustment and be able to anticipate, and thus prevent psychotic episodes. Plainly, the patient must be a fit subject for out-patient treatment. Psychiatric treatment under the compulsion of a court order without the willing cooperation of the patient would obviously be counter-productive.

The danger which the patient poses to himself and others is clearly a factor to be considered in release proceedings. This is the standard utilized by New Jersey under Title 30 civil commitments. *Aponte v. State,* 30 *N. J.* 441, 450 (1959) ; *In re J. W.,* 44 *N. J. Super.* 216, 221–222 (App. Div.) certif den. 24 *N. J.* 465 (1957) ; *In re Heukelekian,* 24 *N. J. Super.* 407, 409 (App. Div. 1953). Dangerousness is not, however, the sole criterion for release. If the patient is in a state of remission and there are sufficient medical assurances that he will pose no threat to society, there may be no danger to be feared from his conditional release. There may, however, be a rehabilitative purpose in retaining the patient in the hospital if further progress can be made in "curing" his underlying condition. Public protection may demand prolonged confinement in hopes of eventual recovery and release.

In any case, dangerousness is an elusive concept. One can look to the type of offense committed or likely to be committed, potential victims, responses elicited to a patient's acts, as well as actual violence towards himself or others.[14] Any violation of the law can be considered dangerous. See Goldstein and Katz, *supra,* 70 *Yale L. J.* at 235. Furthermore, the danger may not have to be limited to the specific

---

[14]See Rubin, "Prediction of Dangerousness in Mentally Ill Criminals," 27 *Arch. Gen. Psychiat.* 397 (1972).

mental problem for which the patient is being treated. Even individuals who have been "restored to reason" may have criminal dispositions. Clearly, dangerousness by itself is not a sufficiently specific guide to the formulation of conditional release standards. It could include any act that "will injure others and will expose the person to arrest, trial and conviction." *Overholser v. Russell*, 108 U. S. App. D. C. 400, 283 *F*. 2d 195, 198 (D. C. Cir. 1960). Violent and non-violent acts may be considered equally "dangerous" in terms of preventing individuals from violating the law. Larceny and murder are equally undesirable in the sense that elimination of all crime is the ultimate goal As far as conditional release is concerned, however, public policy is not necessarily identical for those with incurable mental disorders capable of committing crimes of physical violence and those prone to engage in non-violent acts where their freedom or lifetime incarceration is at stake. But see, *Overholser v. O'Beirne*, 112 U. S. App. D. C. 267, 302 *F*. 2d 852, 861 (D. C. Cir. 1962).

In the District of Columbia, "dangerousness" is the standard to be utilized by the court in evaluating the evidence presented on the question of conditional release. *D. C. Code* § 24–301(e). The court is empowered to order release under such conditions as it shall see fit. The Superintendent of the hospital is the moving authority. Standing alone, his recommendations are "sufficient to authorize the Court" to release the individual in the absence of objections. If such objections are made, a hearing is held to enable the court to weigh evidence and take any action it deems proper. Reasonable expectations as to the patient's future, given the conditions imposed, is the basis of the "dangerous" inquiry.[15]

---

[15]See *Hough v. United States*, 106 U. S. App. D. C. 192, 271 *F*. 2d 458 (D. C. Cir. 1959). The court was careful to point out that even though the individual committed was considered a patient, not a criminal, and that confinement was for therapeutic purposes, the hospital did not have the authority to release the patient from the hospital, even if only for a short period of time. This was considered

The hearing below should result in both findings of fact as to the applicant's state of mental health and the conditions necessary to adequately assure his safe return to society. Such a framework for the decision below is necessary to assure adequate appellate review. The nature of the conditional release hearing is specifically referred to in *United States v. McNeil,* 140 U. S. App. D. C. 228, 434 *F.* 2d 502 (D. C. Cir. 1970). The proceedings are not strictly adversary in nature in that the court has a responsibility to see that all relevant evidence has been marshalled. Release is to occur only "if a combination of conditions may be found that would reduce the likelihood of dangerous behavior below the standard required for commitment . . . ." 434 *F.* 2d at 513 (Bazelon, C. J., concurring).

The judge presiding over the hearing serves as would a jury in resolving conflicting evidence. This is accomplished not only on the basis of what may appear to be the prevailing medical opinion, but also with due regard to the relative experience of the experts, their opportunity for examination and observation of the patient, the internal consistency of the expert's own testimony and demeanor evidence. Even where uncontradicted evidence is presented, these same factors are relevant. If the judge is not satisfied with the amount or quality of evidence presented, he is free to order further examination or appoint additional experts. In dealing with uncontroverted evidence, however, the judge must guard against a complete disregard of expert testimony absent any basis for disagreement. Similarly, the court cannot refuse to release one who is by all indications capable of living among others.

Most states require psychiatric examination of persons charged with a crime when the court learns of their insanity or claim of it. *State v. Whitlow,* 45 *N. J.* 3, 11, n. 1 (1965).

---

beyond the bounds of the hospital's authority and subject to constraints of the statute's conditional release provisions. The statute's purpose is to protect the public as well as to rehabilitate the offender.

In at least one jurisdiction, the patient applying for conditional release has been provided with an "independent" psychiatrist, although not necessarily one of his own choosing.[16] *State ex rel. Hoover v. Bloom*, 461 S. W. 2d 841 (Sup. Ct. Mo. 1971). He is entitled to "fundamentally fair judicial review of his mental condition. No semblance of due process could be claimed if petitioner were left alone to convince a court of his sanity . . . ." 461 S. W. 2d at 844. It has been recognized in New Jersey that the court has inherent power to "authorize the selection of a psychiatrist to make an examination at public expense." *State v. Whitlow, supra*, 45 N. J. at 11. See *State v. Butler*, 27 N. J. 560, 600 (1958).

A more difficult question arises as to the patient's burden of proof. There is little doubt that the burden should be borne by the patient. Psychiatry is by no means an exact science. Protection of the public safety demands that the patient bear the risk of doubt as to his condition. Some states require the patient to demonstrate his eligibility for release by a preponderance of the evidence. *In re Franklin*, 7 Cal. 3d 126, 101 Cal. Rptr. 553, 496 P. 2d 465 (Sup. Ct. 1972); *Newton v. Brooks*, 246 Or. 484, 426 P. 2d 446 (Sup. Ct. 1967); *Mills v. State*, 256 A. 2d 752 (Sup. Ct. Del. 1968). Others hold that all doubts are to be resolved in favor of the public. *Chase v. Kearns*, 278 A. 2d 132 (Sup. Ct. Me. 1971); *State v. Taylor*, 158 Mont. 323, 491 P. 2d 877 (Sup. Ct. 1971), *cert.* den. 406 U. S. 978, 92 S. Ct. 2428, 32 L. Ed. 2d 677 (1972). Still another standard is that the petitioner must show that his sanity is "highly probable," a standard lying between the preponderance and reasonable doubt tests.

---

[16]The *Commission on Criminal Law Revision, Final Report, The New Jersey Penal Code* (1971) provides for such choice on behalf of the offender in Section 2C:4–7(b):

When . . . the defendant wishes to be examined by a qualified psychiatrist or other expert of his own choice, such examiner shall be permitted to have reasonable access to the defendant for the purposes of such examination.

*State v. Blubaugh,* 80 *Wash.* 2d 28, 491 *P.* 2d 646 (Sup. Ct. 1971). In deciding what the burden should be, it must be pointed out that New Jersey provides for a hearing or special verdict on the issue of insanity under *N. J. S. A.* 2A:163–2 and 2A:163–3.[17] Since the patient will have already been declared insane and given the State's concern with public safety, we would think that a burden greater than mere preponderance, as in ordinary civil cases, is required to justify conditional release. However, to require the patient to prove his eligibility for conditional release beyond a reasonable doubt imposes upon him an unfair burden. The judge should authorize conditional release when the evidence clearly and convincingly demonstrates the propriety of this procedure in accordance with the principles enunciated.

Throughout the period of conditional release, it is imperative that the trial court maintain frequent contact with the patient and supervsing psychiatrists. To facilitate this burden of responsibility, the trial judge should require regular and continuous reports to a court appointed probation officer both from the psychiatrists to whom the patient is reporting and from the patient himself. The court must retain jurisdiction over the proceeding. This retention of jurisdiction is essential to enable the authorities to return the patient to the state hospital for psychiatric care immediately upon being notified that some problem has arisen which jeopardizes the safety and well being of the patient or those around him. The ability of the trial judge to immediately recall the patient in a summary fashion is crucial to the court's ability to protect the public from harm. It also neces-

---

[17]Some jurisdictions do not provide for a hearing on the issue of insanity prior to commitment. Acquittal indicates only that there was a reasonable doubt as to defendant's sanity. See *Ragsdale v. Overholser,* 108 U. S. App. D. C. 308, 281 *F.* 2d 943, 950 (D. C. Cir. 1960).

sarily implies some territorial restrictions on the patient's right to travel while under supervision.

█ One further point requires clarification. Those committed pursuant to *N. J. S. A.* 2A:163–2 are to be "maintained as to expense as is otherwise provided for the maintenance of the criminal insane. . . ." The individuals are liable for the cost of their maintenance in State institutions to the extent they are financially able to pay.

One whose route to a charitable institution has been tainted by a criminal proceeding occupies neither a unique nor a preferred position. The concept of forcible detention so obviously present in the case of one subjected to a criminal proceeding applies equally to a patient not similarly experienced. The Legislature did not intend to exempt from liability for maintenance "criminal" patients while requiring civil patients to bear this financial obligation. Such a result would be illogical and inequitable.

No one contends that the State should not support a needy patient whether criminally or civilly committed. But neither should the State nor its taxpayers be burdened with the cost of maintaining one who is financially able to pay. *State v. Le Vien*, 44 *N. J.* 323, 330 (1965).

The cost of psychiatric care for those who obtain conditional releases is no exception. It should be treated as are all other commitment expenses of the criminal insane.

█ These problems will be dealt with as the courts gain experience with conditional release proceedings. We wish only to raise them at this point to alert the trial court to the scope of factors which must be considered. Rarely can the psychiatrist predict a patient's behavior with certainty. Some doubts will always remain. Accepting these doubts, the court's function is to balance protection of the public safety against the therapeutic value and humaneness of conditional release. We have pointed out how certain problems in the determination of release standards have been resolved by other jurisdictions. This has been done in the interest of highlighting problems rather than to direct the trial court to adopt specific decision rules. The foundation of conditional releases is to consist of assuring the public safety with an individualized program of psychiatric out-patient care

coupled with recurrent examinations of social and environmental facts which could affect the patient's recovery.

Our judgment on the question of conditional release renders it unnecessary at this time to reach a claim of unconstitutionality under the equal protection clause. The judgment below is reversed and remanded to the trial court for a hearing consistent with the principles herein discussed.

CLIFFORD, J. (concurring and dissenting in part). Defendant's five year odyssey through a county jail, mental hospital, county jail again, mental retardation facility, mental hospital again, and psychiatric clinic finds him now on the threshold of his return to the New Jersey State Hospital at Trenton under a commitment order.[1] From the Appellate

---

[1] The procedural jungle through which defendant has sought to make his way is portrayed in the majority opinion but perhaps bears repeating in chronological order as an aid to understanding the factual complex.

a. On January 10, 1969 defendant allegedly shot and wounded a police officer in Plainfield, New Jersey. He was lodged in Union County Jail and, in due course, indicted for atrocious assault and battery under *N. J. S. A.* 2A:90–1, armed assault with intent to kill in violation of *N. J. S. A.* 2A:90–2 and *N. J. S. A.* 2A:151–5, and receiving stolen property (a revolver) in violation of *N. J. S. A.* 2A:139–1.

b. On March 18, 1969 Carter was admitted to Trenton State Hospital as a class "B" commitment, as defined by *N. J. S. A.* 30:4–25 ("Where immediate temporary confinement is necessary, owing to the condition of the patient, and where an order of temporary confinement can be obtained before the patient is taken into such institution [for the mentally ill].").

c. On September 5, 1969 defendant was remanded to Union County Jail. The record does not enlighten us as to the reason for the remand or the circumstances under which it was effected.

d. On May 29, 1970 a sanity hearing under *N. J. S. A.* 2A:163–2 was conducted in Superior Court, Union County. The Court took psychiatric testimony from experts for both the State and defendant, and concluded that "defendant was unable to confer with his attorney and assist in the proper defense of his case and * * * was insane at the time of the commission of the crime alleged in the indictment and * * * was insane at the time of the hearing and said insanity continued to that date * * *."

Division's affirmance of that order, one judge dissenting, defendant appeals to this Court, raising the issue of whether the alternative of a conditional release under appropriate supervisory controls for one committed after an acquittal on insanity grounds is permissible under our law.

e. On June 5, 1970 the Court ordered that "the *prisoner*, Milton Carter, be *imprisoned* in the New Jersey State Hospital at Trenton until further order of the Court, upon this *conviction*." (Emphasis added). Presumably, this unexplained, glaringly inappropriate language of "imprisonment" of a mental patient is chargeable to some clerical error, inasmuch as it appears on a typed-in printed form containing other archaic language. It should be noted that on May 10, 1971 the Court issued a "Judgment Nunc Pro Tunc" ordering that defendant be committed to the New Jersey State Hospital at Trenton, pursuant to *N. J. S. A.* 2A:163–2, "until such time as he may be restored to reason as determined by the order of this Court * * *," because "the original judgment prepared and executed in this matter [has] been lost or misplaced," despite which it is reproduced in one of the appendices by way of photostatic copy.

f. On July 1, 1970 an "Order Postponing Trial" indefinitely and transferring the matter to the "off term" was entered, for the reason that defendant has been "adjudged incompetent to stand trial and insane at the time of the act. 6–5–70." The proper procedure, of course, would have been for the charges against defendant to have been dismissed, in keeping with *N. J. S. A.* 2A:163–2. All the parties hereto treat the indictment as having been dismissed, despite the absence of any formal order.

g. On April 21, 1971 a judge of the Superior Court, Mercer County, heard defendant's petition for a writ of *habeas corpus*. The hearing was conducted at the Forensic Psychiatry Unit (Vroom Building) of the New Jersey State Hospital at Trenton. A deputy attorney general and deputy public defender were in attendance. The Court, after hearing testimony of one physician of the Hospital's medical staff, found that Carter was "able to intelligently consult with counsel, form a defense and stand trial on the criminal charges pending against him." The next day he granted defendant's petition for his release and directed that he "be returned to Union County for the purpose of standing trial on the charges now pending against him under indictment No. 311–68."

Ponder, then, defendant's plight at being sent back to a county jail to stand trial on an indictment the dismissal of which had been mandated by statute upon the finding of his insanity at the time of the act with which he was charged, which dismissal had been accomplished more than ten months' previously and the consequence of which, as pointed out by the majority, was to create defendant's status as "not a criminal, but an individual requiring medical atten-

'While I concur with the Court's decision to remand this case to the Law Division for a full hearing to determine if the conditional release is warranted, I am constrained to voice my disagreement with the majority's route to that end, with some of the language used along the way, and with the standard imposed for the trial court's ultimate determination.

tion." I can only conclude that the judge who conducted the *habeas corpus* proceeding was unaware of the June 5, 1970 commitment (or "imprisonment") order.

h. On September 7, 1971 after defendant had languished in Union County Jail to await trial on the now non-existent indictment, the Union County Court, Probate Division, ordered that Carter's parents be appointed his guardians, it having been determined that defendant was "a mental incompetent and incapable of governing himself and managing his affairs." On about that date defendant's parents had Carter civilly committed to the New Libson State School, a facility for the mentally retarded, because, according to his attorney, of the "hospital staff's findings that Milton Carter's basic problem was mild mental deficiency, rather than psychosis."

i. On *November 11, 1971* defendant was "administratively transferred" to the New Jersey State Hospital at Trenton.

j. On January 12, 1972 defendant was released in the custody of his parents as his guardians, this discharge being effected by order of the Medical Director and without any court approval.

k. In March, 1972 the original committing judge wrote the Prosecutor requesting a review of the matter in light of *State v. Maik*, 60 *N. J.* 203 (1972).

l. On June 30 and July 6, 1972, on Motion of the Prosecutor of Union County, a sanity hearing was held, with an assistant prosecutor representing the State and a deputy public defender appearing for defendant.

m. On July 7, 1972 the court held that defendant has "not been restored to reason," and further determined that Carter had been "erroneously released on April 22, 1971 from the New Jersey State Hospital at Trenton." It consequently remanded Carter to the Hospital "until further Order of this Court," which commitment order has been stayed.

n. Since January 12, 1972 defendant has been living at home with his parents and brothers and sisters. He has been gainfully employed and has attended Union County Psychiatric Clinic on a regular basis. While testimony at the June 30 and July 6, 1972 sanity hearing was sharply in conflict as to defendant's mental condition, it was uncontradicted that defendant had been making $80.00 a week of which he gave his mother $20.00 to bank. By the time of the hearing he had saved $300.00. He is now 28 years old and has an I.Q. of 67.

I am persuaded, in light of recent United States Supreme Court opinions, that the constitutional issue here, turning on the equal protection clause, must be addressed. In my view of the case it becomes necessary to discuss that equal protection issue at some length initially, inasmuch as it permeates most of the points sought to be elucidated in this opinion.

## I

## EQUAL PROTECTION

Simply put, equal protection in this area of the mental health field requires that persons committed to a mental institution upon acquittal of a criminal charge on the basis of insanity, *Bolton v. Harris,* 130 U. S. App. D. C. 1, 395 *F.* 2d 642 (D. C. Cir. 1968) ; *Wilson v. State,* 287 *N. E.* 2d 875 (Ind. Sup. Ct. 1972) ; *People v. Lally,* 19 *N. Y.* 2d 27, 277 N. Y. S. 2d 654, 224 *N. E.* 2d 87 (N. Y. Ct. App. 1966) ; *Commonwealth ex Rel. DiEmilio v. Shovlin,* 449 *Pa.* 177, 295 *A.* 2d 320 (Pa. Sup. Ct. 1972), and persons committed because they are incompetent to stand trial must, in important respects, be treated as civilly committed patients, *Jackson v. Indiana,* 406 *U. S.* 715, 92 S. Ct. 1845, 32 *L. Ed.* 2d 435 (1972). The insistence upon identity of treatment, found in the landmark *Jackson* case and *Baxstrom v. Herold,* 383 *U. S.* 107, 86 S. Ct. 760, 15 *L. Ed.* 2d 620 (1966), is perhaps most significant as applied to commitment and release standards, and to the placing of patients in a treatment facility. The majority in the Appellate Division in this case summarily dismissed *Jackson* in one sentence as "inapposite." The majority here makes no mention of the case or of the other consequential federal decisions in this fast-developing field of law, presumably for the reason that the Court finds it "unnecessary at this time to reach a claim of unconstitutionality under the equal protection clause." I find *Jackson* and its companion cases not only supportive of

today's decision and thus apposite — I find those cases controlling.

In *Jackson,* the defendant was a 27 year old deaf mute with the mental level of a pre-school child, who lacked the ability to communicate. His prognosis was dim, and psychiatrists doubted that he would ever acquire the abilities necessary to stand trial for the robberies he allegedly committed. Following a competency hearing the trial court ordered Jackson committed to the Indiana Department of Mental Health until such time as that Department should certify to the court that he was "sane." This order was tantamount to a lifetime sentence since there was no evidence that Jackson would ever improve to the point that he could stand trial. He challenged the court's order on the grounds that his commitment (1) violated the equal protection clause because he was subjected to a more lenient standard for commitment and a more stringent standard for release than those applicable to all other hospitalized patients not charged with criminal offenses, (2) violated due process because there was no showing that his indefinite commitment would serve any valid state purpose.

The standard for commitment under Indiana's civil commitment law was dangerousness. The standard for commitment of an accused, such as Jackson, was simply his inability to stand trial. Further, under the civil commitment statute an individual could be released whenever his condition "justified it" or, in other words, whenever the individual no longer required the custodial care of treatment or detention. However, under the criminal commitment sections the Department of Mental Health had to certify to the court that the accused was "sane." The Supreme Court held that the less stringent commitment standard and the more stringent release standard which were applied to persons accused of committing a criminal act violated the equal protection clause of the Fourteenth Amendment; the mere fact of the existence of the criminal charges did not justify the differential treatment. The Court also held that an indefinite commit-

ment such as that here violated Jackson's due process rights since there was no evidence that the incarceration would help Jackson to attain competency to stand trial.

In so holding, the Court relied in part on *Baxstrom v. Herold, supra,* which had held that a state prisoner who was civilly committed at the end of his prison sentence, by a simple administrative transfer from the prison to the hospital, was denied equal protection by being denied procedural protections afforded other civilly committed persons simply because he had been convicted of a crime. It also held that he should not have been committed to an institution for the dangerously mentally ill without a specific adjudication that he was dangerous, as necessary for all others committed to that institution. Again, the fact of the crime itself, even when the subject had been convicted of it, did not justify the different treatment. See also *Humphrey v. Cady,* 405 *U. S.* 504, 92 S. Ct. 1048, 31 *L. Ed.* 2d 394 (1972); *Bolton v. Harris, supra.* The *Jackson* Court stated that if criminal conviction as in *Baxstrom* did not justify less procedural and substantive protection than that generally available to all others, the mere filing of criminal charges surely cannot suffice.

The *Jackson* and *Carter* cases are essentially the same and, buttressed by *Baxstrom,* lead to the conclusion that the conditional release of Carter is constitutionally mandated (as well as legislatively permissible as held by the Court) on the following analysis: (1) In *Carter,* as in *Jackson,* the challenged commitment is of a person accused of committing a crime, although not tried or convicted of it. (2) In both cases procedures or standards differing from those for release of other mental patients were utilized simply because a criminal charge had been levied against them (if anything, *Carter* presents even a stronger equal protection argument since the charges against him had been dropped; he had been adjudged not responsible for the crime, while in *Jackson* those charges were still pending). (3) In both cases the commitment was for an indefinite period which, barring the decisions in the respective cases, could well have ripened into a

lifetime commitment. (4) Finally, in both cases, the evidence indicated that continued confinement would be unlikely to advance the condition of either Carter or of Jackson. In light of these similarities, it seems to me that Carter's right to equal protection would be violated if this Court were to refuse him the possibility of conditional release which is afforded to other involuntarily committed persons under *N. J. S. A.* 30:4–107,[2] pertinent portions of which read as follows:

A patient admitted to any institution in this State, other than a correctional institution, may be paroled or discharged therefrom in accordance with the rules and regulations prescribed by the board of managers [now the board of trustees by virtue of *N. J. S. A.* 30:4–4a, L. 1972, c. 57, § 3] or the board of chosen freeholders or the proper committee thereof, as the case may be. * * * The chief executive officer of any State institution, other than a correctional institution, subject to regulations of the State Board of Control [now the Com-

---

[2] I confess to a question in my own mind about the extent to which the conditional release provisions referred to are actually employed in our mental institutions. While the concept embodied in this statutory provision is said to be "essential to the modern psychiatric thera-peutic model," Note, "Release from Confinement of Persons Acquitted By Reason of Insanity in New Jersey," 27 *Rutgers L. Rev.* 160, 172 n. 89 (1973), there appear to be no cases discussing this part of the statute, and its use seems to be either limited or non-existent. The reasons for this are, of course, purely speculative. It may be that there is a reluctance on the part of the authorities to resort to the "parole" arrangements, not simply because of an aversion to the parole label as conjuring up "prisoner" connotations, but more importantly because of a concern that the threat of return to the institution may not be a helpful therapeutic aid in the treatment of the mentally ill. I suspect that the psychiatrists would be happy to have imposed upon them legislatively a system of conditional release which would require a new commitment order to the institution upon a failure of the conditions, rather than a return to the institution under the original commitment order, as apparently contemplated by the present statute. I repeat, this rumination is grounded in what I trust is excusable speculation in this area, there being no reliable information in the record before us. However, the legislature has made its declaration of policy, and that in itself provides a most adequate underpinning for the equal protection argument.

missioner of Institutions and Agencies by virtue of *N. J. S. A.* 30:1–2.1, L. 1971, c. 384, § 24], may make arrangements with suitable families for the care, maintenance and treatment of patients of the institution and may place at board on parole in a family with whom any such arrangements have been made, any patient for whom family care shall be deemed beneficial. Patients so placed on parole in family care shall be returned to the institution at any time upon order of the chief executive officer. * * * All such patients placed in family care shall be and remain patients of the institution until discharged therefrom as provided for in this chapter.

The legal jurisdiction of the professional staff of the hospital over any person discharged therefrom shall terminate at the time of discharge of the person from in-patient status. However, upon recommendation of the professional staff of the hospital, patients so discharged may continue to receive further professional services on an outpatient basis or may be assisted in securing continued treatment from other community resources. * * *

## II

## CRIMINAL AND CIVIL COMMITMENT

Woven into the fabric of this case is a thread of confusion to which our criminal commitment statute, *N. J. S. A.* 2A:163–2, has contributed. It has long troubled courts, lawyers and legislators. The question becomes especially critical in light of the prominence attained by equal protection in the mental health field as a result of *Jackson* and *Baxstrom*. The problematic issue to which I refer is the distinction between a "criminal commitment" and a "civil commitment." I suggest that for practical purposes a person subject to "criminal commitment" is one who is subject, at the time of commitment, to the process of the criminal justice system. Under this definition, one in Carter's position would not be a criminal committee, but rather a civil committee. The indictment against him has been dismissed. He has been convicted of no criminal activity. He therefore can be involuntarily detained only under the same procedures, the same standards, and in the same institutions as any other involuntary civilly committed patient; and to the extent that *N. J. S. A.* 2A:

163–2 conflicts with these principles in their application to Carter, it invites a declaration of constitutional infirmity.[3]

On the other hand, a person subject to criminal commitment procedures would be one against whom an indictment is still pending as, for example, one found incompetent to stand trial, or one who has been convicted of the crime charged. Note, however, that even persons in the "criminally insane" category may insist on treatment accorded civil patients in most respects.[4]

Because I read equal protection to dictate equal treatment for persons acquitted on grounds of insanity and other involuntary civil committees, not only must the conditional release provision of *N. J. S. A.* 30:4–107 be available to those in Carter's position but, strictly speaking, it must be applied identically to both groups. The question arises, then, as to

---

[3] While I need not reach the point in this opinion, I would also observe that this interpretation is consistent with the United States Supreme Court's language to the effect that penalizing someone for having a "disease" constitutes cruel and unusual punishment. *Robinson v. California*, 370 *U. S.* 660, 82 S. Ct. 1417, 8 *L. Ed.* 2d 758 (1962); *Powell v. Texas*, 392 *U. S.* 514, 88 S. Ct. 2145, 20 *L. Ed.* 2d 1254 (1968).

[4] Procedures to commit must certainly be the same. In *United States ex rel. Schuster v. Herold*, 410 *F.* 2d 1071 (2d. Cir.), cert. denied 396 *U. S.* 847, 90 S. Ct. 81, 24 *L. Ed.* 2d 96 (1969) it was held that a prisoner who had been transferred during his prison term to Dannemora State Hospital for the criminally insane without notice or hearing, as was accorded to civilians undergoing commitment, was entitled to a hearing under the equal protection clause. Such prisoner, it was held, would be subject to additional deprivations and indignities in the hospital above those he suffered in prison, and would additionally be effectively deprived of the opportunity for parole. Therefore, he was entitled to substantially all the procedures granted to noncriminals who are involuntarily committed. Additionally, the same test for commitment must be applied to both classes of persons. Other cases standing for essentially the same principle are *Matthews v. Hardy*, 137 U. S. App. D. C. 39, 420 *F.* 2d 607 (D. C. Cir. 1969); cert. denied 397 *U. S.* 1010, 90 S. Ct. 1231, 25 *L. Ed.* 2d 423 (1970); *Commonwealth v. Druken*, 356 *Mass.* 503, 254 *N. E.* 2d 779 (Sup. Jud. Ct. Mass. 1969).

the necessity for court control over the conditional release of Carter, when such release is left to the sole discretion of the chief executive officer of the hospital in cases of other civil commitments. Although I have some reservations about the constitutionality of this differential in treatment of the two groups, I am satisfied for the time being to accept it, as did Judge Bazelon in *Bolton v. Harris, supra.* In that case, while finding that persons acquitted on insanity grounds must be treated in all other respects as civilly committed patients, he concluded that equal protection is not offended by allowing the government or the court the opportunity to insure that standards for release of civilly committed patients are faithfully applied to patients committed after having been found not guilty by reason of insanity. Id. 395 F. 2d at 652. See also *United States v. Ecker,* 156 *U. S.* App. D. C. 223, 479 *F.* 2d 1206 (D. C. Cir. 1973). Thus the Court may retain some control over the *Carter*-type patient.

## III

## VIABILITY OF *STATE v. MAIK*

*State v. Maik,* 60 *N. J.* 203 (1972), dwelt on by the majority here, and by the majority and the dissenter in the Appellate Division, undertook to define the phrase "restored to reason" as a standard for release of persons adjudged not guilty by reason of insanity under *N. J. S. A.* 2A:163–3. As interpreted by that case the standard for release is a most stringent one; not only must the psychotic episode which produced the criminal act have subsided, but the underlying illness must have been removed or effectively neutralized if it can be. Clearly adherence to this standard, likewise applicable under the companion statute, *N. J. S. A.* 2A:163–2, will lead in many cases to lifetime confinements, as recognized by the majority here. I question both the wisdom of that standard and its constitutionality.[5] The majority seems

---

[5] In *Davy v. Sullivan,* 354 *F. Supp.* 1320 (M. D. Ala. 1973) a United States District Court, citing *Jackson,* held that the release

also to question its wisdom but seeks to lessen its impact by providing for conditional release in appropriate cases. Parenthetically I should observe that I find absolutely no warrant for the majority opinion's statement that the *Maik* Court "indicated that something less than a 'cure' is acceptable for compliance with the 'restored to reason' standard of conditional release established by *N. J. S. A.* 2A :163–2 and 2A :163–3."

I would point out that *Jackson,* which was decided since *Maik,* raises doubts about the constitutionality of *Maik's* holding, both as a matter of due process and of equal protection. *Jackson* held that "due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." *Jackson v. Indiana, supra,* 406 *U. S.* at ´738, 92 S. Ct. at 1858, 32 *L. Ed.* 2d at 451. If an underlying illness cannot be cured, no rehabilitative purpose can be served by continued confinement; if that illness is in remission, such that the patient is no longer dangerous, societal safety is not served either by that confinement. Additionally, because this is a more strict standard than that applied to the other involuntary civilly committed patients, it runs afoul of the equal protection clause of the Fourteenth Amendment.

## IV

### TEST FOR COMMITMENT

I further question the statement in the majority opinion which hinges commitment to a mental institution on a finding of insanity according to the *M'Naghten* standards. Research has disclosed no other jurisdiction in which commitment turns on such a test. This Court's opinion in *Aponte v.*

---

of a person incarcerated under Alabama's sexual psychopathic statute cannot constitutionally be conditioned on full and permanent recovery where he is not likely to benefit from further treatment and where he is not dangerous to himself or others.

*State,* 30 *N. J.* 441 (1959), as I read it, clarifies the point. *Aponte* explains that there are three specific and separate tests for insanity, depending on the purpose of the insanity determination. The *M'Naghten* standard is to be used for determining whether an accused was insane at the time the criminal act was executed. To decide whether a defendant is "sane" enough to stand trial, the test to be used is whether the accused understands the nature of the proceedings against him and whether he is capable of assisting counsel with his defense. To decide if he is presently insane such that commitment is warranted, he must be dangerous to himself or others. See also *State v. Coleman,* 46 *N. J.* 16, 40 (1965), cert. denied, 383 *U. S.* 950, 86 S. Ct. 1210, 16 *L. Ed.* 2d 212 (1966) ; *State v. Caralluzzo,* 49 *N. J.* 152 (1967). As *Aponte* points out, the standards are not explicitly stated in either New Jersey's criminal or civil commitment statutes, but they should be read in. And again, I believe that equal protection mandates that the same standard be used for someone in Carter's position (not guilty by virtue of insanity) as for all other civilly committed persons — that is, the standard of dangerous to self or others. *Aponte v. State, supra,* 30 *N. J.* at 455; *In re Heukelekian,* 24 *N. J. Super.* 407, 409 (App. Div. 1953).

## V

## LEAST RESTRICTIVE ALTERNATIVE DOCTRINE

This case affords the Court an opportunity to incorporate the principle of the least restrictive alternative into our body of law governing criminal and civil commitments. We should accept it as a judicial interpretative tool. Under this principle, Carter would be conditionally released as a "less restrictive alternative" to full commitment, should it be demonstrated at a hearing that he is a fit subject for such release.

The classic statement of this principle in . the mental health field[6] is that of Judge Bazelon in *Lake v. Cameron,* 124 U. S. App. D. C. 264, 364 *F.* 2d 657 (D. C. Cir. 1966). There an elderly woman had been found wandering around, unable to care for herself. At a hearing she was found to be suffering from "chronic brain syndrome" associated with aging. She was adjudged of unsound mind and committed. In an action for *habeas corpus* relief, the Court of Appeals for the District of Columbia remanded the case to the District Court for inquiry into other less drastic courses of treatment. The alternative course of treatment, said the court, should be fashioned as the interests of the person and the public require. See also *Covington v. Harris,* 136 U. S. App. D. C. 35, 419 *F.* 2d 617 (D. C. Cir. 1969); *Ashe v. Robinson,* 146 U. S. App. D. C. 220, 450 *F.* 2d 681 (D. C. Cir. 1971) (doctrine is applied to someone acquitted on grounds of insanity). The majority opinion here seems almost to speak to this point when it indicates that rehabilitative ends might be better served by conditional release to a more normal environment. Since *Lake,* at least two courts have held that those seeking involuntary commitment must, as a requirement of due process, inquire into less restrictive alternatives to incarceration. *Lessard v. Schmidt,* 349 *F. Supp.* 1078 (E. D. Wis. 1973), rev'd on other grounds, 414 U. S. 473, 94 S. Ct. 713, 38 *L. Ed.* 2d 661 (1974); *Matter of Kesselbrenner v. Anonymous,* 33 *N. Y.* 2d 161, 350 N. Y. S. 2d 889 (N. Y. Ct. of App. 1973). Indeed, such an approach follows naturally from *Jackson's*

---

[6]The least restrictive alternative doctrine has been utilized widely in other areas of constitutional law. *E. g., Dean Milk Co. v. City of Madison,* 340 *U. S.* 349, 71 S. Ct. 295, 95 *L. Ed.* 329 (1951) (burden on interstate commerce); *Shelton v. Tucker,* 364 *U. S.* 479, 81 S. Ct. 247, 5 *L. Ed.* 2d 231 (1960) (free association); *Dunn v. Blumstein,* 405 *U. S.* 330, 92 S. Ct. 995, 31 *L. Ed.* 2d 274 (1972) (voting rights). The classic article on the subject is Wormuth & Mirkin, "The Doctrine of the Reasonable Alternative," 9 *Utah L. Rev.* 254 (1964).

due process holding that there must be some reasonable relation between the nature and duration of confinement and the purpose of which the individual is committed.

## VI

## STANDARD FOR CONDITIONAL RELEASE AND BURDEN OF PROOF

Finally (and this is the basis for my partial dissent) I am troubled by my inability to discern from the majority opinion what standard the Court would require a patient to meet in order to establish his eligibility for conditional release, and I am equally disturbed by the burden of proof — clear and convincing — which the majority decides Carter will have to sustain at his conditional release hearing.

As to the first, the majority says at one point that

[d]angerousness is not * * * the sole criterion for release. If the patient is in a state of remission and there are sufficient medical assurances that he will pose no threat to society, there may be no danger to be feared from his conditional release. There may, however, be a rehabilitative purpose in retaining the patient in the hospital if further progress can be made in "curing" his underlying condition. Public protection may demand prolonged confinement in hopes of eventual recovery and release.

If this statement is intended to suggest that the state can take it upon itself to act *in loco parentis* to "rehabilitate" an involuntary civilly committed patient, I think the notion is nothing short of reprehensible. It is "big brotherism" at its worst. It amounts to the state taking someone never convicted of a crime and, lacking the "dangerousness" element, saying "we think it is for your own benefit to be locked up for a lifetime."

Seemingly consistent with this first statement of a criterion is the observation later in the majority opinion that "[c]learly, dangerousness by itself is not a sufficiently specific guide to the formulation of conditional release standards." However, later it is said that "[r]elease is to occur only 'if

a combination of conditions may be found that would reduce the likelihood of dangerous behavior below the standard required for commitment \* \* \*.' " The latter is adopted from Judge Bazelon's concurring opinion in *United States v. McNeil,* 140 U. S. App. D. C. 228, 434 *F.* 2d 502 (D. C. Cir. 1970) and to me is plainly incompatible with the majority's earlier efforts to articulate a standard, quoted above. I think the trial judge is entitled to clearer guidance than these irreconcilable statements furnish him. For myself, it is apparent from what I have said elsewhere in this opinion that I would permit the conditional release to occur upon a showing that defendant has reached a stage where he is no longer dangerous to himself or others as long as he complies with the terms and conditions imposed on him by his conditional release.

But to require him to meet that standard by any more than the mere preponderance of the evidence revokes to a great extent the benefits of conditional release which is, by definition, something of a gamble. The standard of "clear and convincing proof" lies somewhere between the ordinary civil requirement of "preponderance of the evidence" and the criminal rule of "beyond a reasonable doubt." *New Jersey Rules of Evidence,* § 1(4)–4. However, at least two New Jersey cases have stated that "the line of demarcation between what is 'clear, satisfactory and convincing' and that which removes 'all reasonable doubt' is more fanciful than real," *In re Calef,* 109 *N. J. Eq.* 181 (Prerog. 1931), aff'd 111 *N. J. Eq.* 355 (E. & A. 1932), cert. denied *sub nom. Neely v. Stacy,* 288 *U. S.* 606, 53 S. Ct. 397, 77 *L. Ed.* 981 (1933); *State v. Cale,* 19 *N. J. Super.* 397 (App. Div. 1952). Regardless of whether the "clear and convincing" test is viewed as being this strict or slightly less so, it is a difficult standard to meet — probably so difficult that as a practical matter Carter, or others in his position, are unlikely to be conditionally released if they must sustain this burden.

Application of the "clear and convincing" standard in the context of release of mental patients is novel in New Jersey.

As *Mc Cormick, Evidence* 679 (1954) indicates, "clear and convincing" is commonly utilized only where there are special dangers of deception by the party on whom this burden is imposed. Therefore, that text tells us, this burden has been imposed where the undue influence of a mental incompetent is at issue, where an oral contract to make a will is sought to be proved, in suits for specific performance of an oral contract, where the terms of a lost will are being established, or where fraud is in question. New Jersey's use of the "clear and convincing" standard has been even more limited. It has been adopted judicially to preserve the strong policy of the Statute of Wills, *N. J. S. A.* 25 :1–1 *et seq.,* which requires all wills to be in writing, and of the Statute of Frauds, *N. J. S. A.* 3A :3–2, requiring certain types of contracts to be in writing. Where the courts have felt that equity dictated enforcement of such instruments, although not in writing, they have instituted the stricter standard of proof to "forestall trumped-up prayers for relief." *Aiello v. Knoll Golf Club,* 64 *N. J. Super.* 156 (App. Div. 1960). See also *In re Calef, supra; State v. Cale, supra; Coddington v. Jenner,* 57 *N. J. Eq.* 528 (Ch. 1898), aff'd 60 *N. J. Eq.* 447 (E. & A. 1900). Additionally, this test has been adopted statutorily to relieve the harshness of the "dead man's rule" that no oral evidence may be introduced against a dead man's estate or his representatives. Under this statute, *N. J. S. A.* 2A :81–2, such evidence can be introduced, but proof of a claim against a dead man, relying upon such evidence, must be by "clear and convincing" proof, to guard against fraudulent claims in an area peculiarly open to trickery. For examples of cases applying this standard under the same statute, see *Moran v. Estate of Pellegrino,* 90 *N. J. Super.* 122 (App. Div. 1966) ; *Buska v. Aquinaldo,* 84 *N. J. Super.* 577 (Law Div. 1964).

No such mitigating factor presents itself in a conditional release decision. Such a proceeding is a simple civil determination and the standard normally utilized — preponderance of evidence — is the proper burden of proof for the

committed patient to bear. *Hough v. United States,* 106 U. S. App. D. C. 192, 271 *F.* 2d 458 (D. C. Cir. 1959); *Bolton v. Harris, supra; In re Franklin,* 7 Cal. 3d 126, 101 *Cal. Rptr.* 553, 496 *P.* 2d 465 (Cal. S. Ct. 1972); *Newton v. Brooks,* 246 *Or.* 484, 426 *P.* 2d 446 (Or. Sup. Ct. 1967); (en banc); *contra, State v. Blubaugh,* 80 *Wash.* 2d 28, 491 *P.* 2d 646 (Wash. Sup. Ct. 1971).

At the risk of being repetitious, I also observe that the "clear and convincing" standard seems open to constitutional challenge since it is a higher standard than that which all other civilly committed mental patients must meet; thus, it violates the equal protection clause of the Fourteenth Amendment. As I have already pointed out, *Jackson v. Indiana, supra,* addressed itself specifically to the problem of more stringent commitment and release standards in the case of an unconvicted mental patient, and struck down a statute which imposed them. Additionally, as a policy matter, I would strike down a standard which seems to ignore the high value which has always been placed on human liberty by the American system of justice. In a day when some courts are requiring states to prove dangerousness "beyond a reasonable doubt" before they can involuntarily civilly commit someone, *e. g., In re Ballay,* 482 *F.* 2d 648 (D. C. Cir. 1973); *Lessard v. Schmidt, supra,* I do not agree that New Jersey's policy should be to create such a difficult route for conditional release as is imposed here.[7]

---

[7]The justification suggested by the majority opinion for elevating the standard of proof to "clear and convincing" is that public safety would be undermined by a lesser standard. To support this rationale, the Court discusses the inexactness of psychiatry as a science, implying that because of it psychiatrists might easily testify erroneously as to a patient's dangerousness, with the result that many still-dangerous patients would surely be released. However, I read psychiatric uncertainty to mitigate in favor of just the opposite result. It seems to me far more likely that psychiatrists, who incline toward treating persons whom they view as "abnormal," are likely to be more, not less, cautious in recommending release of a committed patient than is really warranted. See Singer, "Sending Men to Prison: Constitu-

The Court has today extended the application of a creative principle of law. It would be a bitter irony were the conditional release concept, both noble in principle and practical in its effect, permitted to founder on the shoals of an indefinite standard and an entirely inappropriate burden of proof. I fear that may be its fate. Therefore, as to those portions of the majority opinion which require meeting a standard greater than "dangerous to self or others" by a burden of more than "preponderance of the evidence," I dissent.

CLIFFORD, J., concurs in result.

*For reversal and remandment*—Justices JACOBS, HALL, SULLIVAN, PASHMAN and CLIFFORD—5.

*For affirmance*—None.

tional Aspects of the Burden of Proof and the Doctrine of the Least Drastic Alternative as Applied to Sentencing Determinations," 58 *Cornell L. Rev.* 51, 84 (1972). That this is so is demonstrated by results of the mass exodus from maximum security mental institutions following the decision in *Baxstrom v. Herold, supra.* Before this decision, prisoners who had served out their terms and who were still considered "dangerous" were automatically transferred to maximum security criminal mental hospitals. When this procedure was declared violative of equal protection, 900 "dangerous" inmates were transferred to less secure institutions, and of these over 140 were released completely within one year. See Hunt & Wiley, "Operation Baxstrom after One Year," 124 *Am. J. Psychiatry* 974 (1968). Additionally, a leading criminologist has stated that psychiatry cannot assure, even to a 50% likelihood, that a given person is "dangerous," Morris, "Psychiatry and the Dangerous Criminal," 41 *S. Cal. L. Rev.* 514 (1968).